In re Mark Allen YOUNG, and Anna Marie Warrender, Debtors.

Ron SMITH, Lead Resources of America, Inc., Plaintiffs,

v.

Mark Alan YOUNG, Defendant.

Ronald G. MALENBAUM, Camilla Warrender, Marianne Grin, and Elisabeth Shure, Plaintiffs,

v.

Mark Alan YOUNG, Defendant.

Bankruptcy No. 94–05359–A7.
Adv. Nos. 96/90321, 96/90323.

United States Bankruptcy Court, S.D. California.

April 4, 1997.

---

**13.** *See also Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1297 (9th Cir.1994); *Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1059 (9th Cir.1994)

("The [Bankruptcy] Code is designed to afford debtors a fresh start, and we interpret liberally its provisions favoring debtors.").

Bruce M. Douthit, San Diego, CA, for Defendant Young.

Robert Scott Dreher, Jeffrey & Dreher, L.L.P., San Diego, CA, for Plaintiffs Malenbaum and Smith.

### AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER

JOHN L. PETERSON, Chief Judge.

In this consolidated adversary proceeding, Plaintiffs Ron Smith and Lead Resources of America, Inc., filed Adversary Complaint No. 96/90321, on May 20, 1996, objecting to the discharge of certain debts owed them by Debtors/Defendants, Mark Alan Young and Anna Marie Warrender, under 11 U.S.C. § 523. On the same date, Plaintiffs Ronald G. Malenbaum, Camilla Warrender, Marianne Grin, and Elisabeth Shure, filed Adversary Complaint No. 96/90323, also objecting to Debtors' discharge under § 523. The adversary proceedings were subsequently transferred to this Court under the Ninth Circuit Workload Equalization Pilot Program. Upon receipt and review of the answers to the complaints filed by Debtors, the Court, by its Order of July 16, 1996, consolidated the two adversary actions for adjudication.

Subsequently, after due notice, trial was held on December 4–6, 1996, at San Diego.

At trial, Debtor/Defendant Ann Marie Warrender agreed, after consultation with counsel, to accept a stipulated judgment against her in exchange for being dismissed from the case, which settlement the Court orally approved. (It is noted, however, that as yet no written stipulation has been filed for the Court's formal approval.) With the dismissal of Anna Marie Warrender, trial then went forward against Debtor/Defendant Mark Alan Young, who appeared represented by Counsel Bruce M. Douthit. Counsel Robert Scott Dreher appeared for all Plaintiffs in both adversary proceedings, including Ronald G. Malenbaum, Camilla Warrender, Marianne Grin, and Elisabeth Shure on Adversary Complaint No. 96/90323 (collectively referred to hereinafter as "Malenbaum Plaintiffs"), and Ron Smith and Lead Resources of America on Adversary Complaint No. 96/90321 (collectively referred to hereinafter as "Smith Plaintiffs").

Testifying at trial were Ronald Malenbaum, Ron Smith, Mary Jean Warrender, Lee Hoff and Mark Alan Young. Plaintiffs introduced Exhibits 1A–1M, 2A–2E, 3, 8, 11, 15A–15R, 16, 17, 20, 22, 23, 24, 25A–25EE, and 31–37. Defendant Young introduced Exhibits A–E. At close of trial, the Court left the record open until January 15, 1997, to allow the deposition of Anna Marie Warrender to be taken and submitted into evidence. The parties were also given until January 15, 1997, to submit proposed findings of fact and conclusions of law. Subsequently, the parties made timely filings in support of their respective positions, and, on March 6, 1997, the Court entered its Findings of Fact, Conclusions of Law and Order disposing of the matter. Prior to entry of judgment, however, it came to the Court's attention that subsequent to the filing deadline for the parties' post-trial memoranda, the Ninth Circuit Court of Appeals issued a decision clarifying the burden of proof in a § 523(a)(4) nondischargeability action when applying California state law that could have affected the outcome on Plaintiffs' instant action. *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1461 (9th Cir.1997). Consequently, the Court issued its Order of March 19, 1997, allowing the parties to submit briefs arguing the implication of the holding in *Niles* for the issues

herein. Upon the filing and the Court's consideration of these memoranda, the Court finds amendment of its March 6, 1997, Findings of Fact, Conclusions of Law and Order warranted. Such decision is completely supplanted by the following Findings of Fact and Conclusions of Law.

## I. *FINDINGS OF FACT*

Two groups of investors placed funds with Defendant Mark A. Young (referred to hereinafter singly as "Young") and Anna Marie Warrender (referred to hereinafter singly as Anna Marie; both referred to collectively hereinafter as "Debtors") for investment in the purchase, renovation and resale of residential real property in the San Diego area: The Malenbaum Plaintiffs, and the Smith Plaintiffs. The Court will first discuss the former, and then turn its attention to the latter.

### A. *Malenbaum Plaintiffs*

Around Chistmastime, 1992, Anna Marie phoned her sister Camilla Warrender ("Camilla") to let her in on what seemed to Camilla, and her longtime "fiancee" and housemate, Ronald Malenbaum ("Malenbaum"), to be a splendid investment opportunity in California real estate. (Tr.V.I, pp. 17–18). To better convey the advantages of the prospect, Anna Marie and her then fiancee, Young, in March of 1993, flew from San Diego to Cape Cod, Massachusetts, where Camilla and Malenbaum lived, and stayed as houseguests for several days. (Tr.V.I, pp. 18). During their visit they painted a picture in which the two operated as president (Anna Marie) and vice president (Young) a thriving real estate business called "Develacor, Inc." (*Id.;* Exhibit 3). Develacor purchased rundown homes, refurbished and remodeled them, and sold the newly renovated residences at a handsome profit for the company and its investors. (Tr.V.I, p. 18–21, 30–31).

Debtors both explained in detail how investor funds were dedicated to particular properties when tendered, how transactions were secured by deeds of trust on those individual properties, and how they controlled this investing "by keeping very, very close accounts on every single property and … a computerized data base." (Tr.V.I, pp. 20–21, 29–30). By way of assuring Camilla and Malenbaum

that Develacor did not commingle investor funds, but dedicated and secured specific investments to specific properties, Young described how he had fired an employee of the company for misapplying to another project monies specifically invested for a predesignated property renovation. (Tr.V.I, pp. 29, 43–44). Indeed, Young and Ann Marie had told their perspective investors that commingling of investor funds would violate the law. (Tr.V.I, p. 33; 95). These representations, as well as Debtors' close "family" relationship with Camilla and Malenbaum, induced the latter two to invest significant funds with Develacor over a period beginning in early 1993 and lasting until late 1995. (Tr.V.I, p. 21, 26, 30–31; 92–93). Notwithstanding the family and family-like relationships among the parties, however, Malenbaum frankly testified that he and Camilla would never have invested funds with Develacor had Debtors not assured them that such interests would enjoy recorded secured status. Neither Malenbaum nor Camilla would have invested with Develacor had its two officers not represented that they would never commingle monies secured by deeds of trust in a general expense or operating account not dedicated to specific properties. (Tr.V.I, pp. 33, 35).

Regarding Debtors' account of their expertise in business, real estate development and law, the two made several misrepresentations in a marketing brochure they showed Malenbaum and Camilla. (Exhibit 3). The document misstates both parties' education in these fields. (Tr.V.I, pp. 83–84). It also fails to disclose Young had a criminal conviction for real estate fraud in New Mexico. (Tr.V.I, pp. 93–94, VIII, p. 116). Malenbaum testified that these credentials, among other things, reassured him of the pair's bona fides, and about their ability to make good business judgments. Had he known that they did not possess such well-rounded formal educations, or of the criminal conviction, he would have been less likely to entrust funds to them. (See, e.g., Tr.V.I, pp. 34–35). The document also contains misrepresentations about the success of their business. (Tr.V.I, p. 86).

Relying thus, Malenbaum and Camilla invested in a number of properties managed by Develacor. Malenbaum also acted as investing agent for Plaintiffs Shure and Grin. Relying on the same representations that induced him so to act, Malenbaum advised Shure and Grin to invest in Develacor as well. (Tr.V.I, p. 58). Every investment, however, was made only after Malenbaum visited and viewed the particular property the investment was contemplated to improve, and with the express understanding that the funds used would be dedicated to renovation of the particular property. (Tr.V.I, p. 57). With this understanding, Develacor would issue a promissory note to the investors upon receipt of funds, which would not show an interest rate, but would have built into the amount payable on the note a 20% return on the investor's contribution. (Tr.V.II, p. 63; VIII, pp. 47, 79). Each note, at least six of which bore the express heading "Note Secured by Deed of Trust," should have then been secured with a deed of trust on the particular parcel Malenbaum or Camilla had provided funds to renovate. (Tr.V.I, pp. 57–58; e.g., Exhibits 15A–15C).

A summary of The Malenbaum Plaintiffs' investments is:

| | PROPERTY | RELATED EXHIBITS | AMOUNT INVESTED |
|---|---|---|---|
| 1. | 2286 Bonita Street | 1C; 15A–15C | $31,000 |
| 2. | 2640 69th Street | 1B; 1D; 15G | $38,000 |
| 3. | 3737 Granada Street | 1E; 15H | $25,000 |
| 4. | 6911 Via Valverde (Grin) | 1F; 15I | $10,000 |
| 5. | 7191 Eldridge St. (Shur) | 15J; 15O | $35,000 |
| 6. | 4815 La Jacaranda | 1G; 15N | $60,000 |
| 7. | 4451 44th Street | 1J ($35K); 15P; 16 | $35,000 |
| 8. | 9474 Avenida Acero | 1K; 15K | $14,000 |
| 9. | 3419 Bancroft Street | 1L; 15L | $14,000 |
| 10. | 2564 Chatham Street 1 | * * * | * * * |
| 11. | 4803 Marlborough Street | 1M; 15M | $10,000 |

On all but one property (4451 44th Street) no deeds of trust in Malenbaum's Camilla's, Grins or Shure's favor were ever recorded. (Tr.V.I, p. 26; Plfs.' Req. for Judicial. Notice, ¶ 1, dated December 2, 1996 and granted by the Court on December 4, 1996).

A secured deed of trust was in fact recorded on the 4451 44th Street parcel. Nevertheless, Debtors represented to Malenbaum when he invested in this property that they would need a power of attorney signed by

him to facilitate a quick turn-around sale on this particular property, and so he gave them one to dispose of his interests in such when time for sale arrived. (Tr.V.I, p. 60; Exhibit 1F). Rather than sell the property, however, Debtors used the power of attorney to enhance further the senior secured interest holder on the property by $15,000, depriving the second place holder, Malenbaum, of any equity in his position. After doing so, to cover their misdeed, Debtors lied to Malenbaum, telling him that they could not turn the property around quickly because of certain litigation that had arisen with a former employee, and so had never needed to use the power of attorney. (Tr.V.I, p. 60–63; Exhibits 15P and 16). This entire tale was a blatant falsehood.

Finally, in January of 1995, Develacor failed to remit a short-term investment made by Malenbaum that they had agreed to return by December 15, 1994. From then on, Develacor, it principals or officers never met another obligation to the Malenbaum Plaintiffs. (Tr.V.I, p. 64). By October of 1995 all of Develacor's investment properties had fallen into foreclosure, and the Malenbaum Plaintiffs received nothing on their unsecured positions. The only return they ever received on any of their investments on these particular properties was $5,000.00 to Malenbaum, (Exhibit 1I), and $2,000.00 to Grin, (Exhibit 1F). As of November 7, 1995, Debtors acknowledged that they owed the Malenbaum Plaintiffs $301,315 on the promissory notes secured by deeds of trust given to them in exchange for their real estate investments. (Exhibit 17).

In addition, contrary to Debtors' specific and repeated representations to Malenbaum and Camilla that they never commingled funds, and that they maintained each property as a separate financial entity, Develacor actually maintained only one business account, a general expense operating account, into which they placed all invested funds. (Tr.V.I, pp. 35–40; Exhibit 1H). Whenever

---

1. While Malenbaum testified he invested in the Chatham Street Property, he never specified how much. He did intimate a portion of Exhibit 1L, a check for $14,000 may have included funds for both the Chatham and Bancroft properties, but he never made the relative amounts clear at trial. The Court finds from the record, however, that Exhibit 1L and 15L pertain only to the Bancroft property.

Young or Anna Marie received funds from the Malenbaum Plaintiffs, which the former represented and the latter intended would be used only for improvement of, e.g., the La Jacaranda property, the monies really went into the general account and were often used for completely unrelated transactions. To expand on this example, on June 7, 1994, Malenbaum wrote a check for $60,000.00 payable to Markam Enterprises, Young's d/b/a, for investment in the La Jacaranda property. (Exhibits 1G, 15N). As with all such investments, Malenbaum had been promised these funds would be placed in a separate account dedicated solely to the renovation of the designated property. (See, e.g., Tr. V.I, pp. 20–21, 29–30). Instead, however, the funds were deposited in Develacor's operating account, record of which appears as a June 10, 1994, deposit on Develacor's check register. (Exhibit 1H). Later, however, on June 15, 1994, Develacor used portions of the funds Malenbaum invested in and supposedly dedicated to the La Jacaranda property to repay Malenbaum on his 2286 Bonita Street investment. (Id., Exhibits 1C; 15–A–15C). This subterfuge could serve as an archetypical example of the age old "Ponzi Scheme."

For his part, Young disavows the central factual issues asserted by the Malenbaum Plaintiffs. First, he avers he never told them the investments would be secured. Second, while Young admits the company had but one bank account, into which all funds invested were deposited and commingled, (Tr. V.II, p. 49; V.III, p. 150), he denies that he told them Malenbaum and Camilla the investments would be segregated by properties and never commingled with general operating accounts. Further, although acknowledging that they invested money with Develacor, of which he was a vice president, Young maintains that he told Malenbaum and Camilla from the outset of the unsecured, speculative nature of their investments. This fit into a multi-tiered investment scheme, in which first and second position secured investors received 11–15% on their capital, and investors in unsecured general operating funds such as those provided by the Malenbaum Plaintiffs received 20–30% on their investments. (Tr.V.II, p. 70–73). Thus, Young says, the 20% premium

built into, for instance, the La Jacaranda note, reflected both the investors' level risk and their rate of return. At no point were their investments ever to be secured. This explanation, however, fails to explain why documents related to the 69th Street property, (Exhibits 1D and 15G), and the Via Valverde property, (Exhibit 15I), do not comport with the three tiered scheme—20% return on $20,000 investment secured by an express deed of trust, rather than 20% for an unsecured investment—or why no deed of trust was ever recorded or these parcels or the Bonita Street property. (Exhibits 15A–15C).

Thus, the dispute between Young and the Malenbaum Plaintiffs does not come down to a sole contest of credibility on who made what oral representations and when. The documentary record supports Malenbaum. For instance, Young testified that as an experienced real estate broker and sales executive, he knew the difference between secured and unsecured real estate investments. (Tr. V.III, p. 169). Consequently, Young knew the importance of filing a notice of security interest with the appropriate recording office to secure the "Note Secured by Deed of Trust" on the 69th Street property. Yet, he never bothered to see that such was done. Young's inaction, in full knowledge of its import, reveals an intent to deceive hatched from the outset. Young claims the use of documents so entitled in this case was a mere oversight, and contrary to Malenbaum's testimony, that he never told Malenbaum that the investments would be secured. (Tr.V.III, pp. 130–134). The documents, however, originated with Young and Develacor. Thus Young's own words and documents condemn him while Malenbaum's version of events consistently harmonizes with the documentary record Young's company produced.

Moreover, Young does not dispute the record of dishonesty revealed in the ruse to secure Malenbaum's power of attorney (Exhibit 16), or its misuse to subordinate Malenbaum's interest in the 44th Street Property (Exhibit 15P). Given these factors, the Court finds Malenbaum's testimony more credible than Young's denials. In sum, the Court determines from the record that Young, with an intent to deceive, misrepre-

sented that the investments made by Malenbaum would be secured, and that the investments would never be commingled with general operating funds.

## B. *Smith Plaintiffs*

Plaintiff Ron Smith ("Smith") and his consulting firm, Lead Resources of America, had a much different relationship with Young than did Malenbaum. Smith initially invested with Debtors at arms' length, after responding to a newspaper advertisement announcing investment opportunities in San Diego real estate. (Tr.V.I, pp. 105, 114). A seasoned investor, Smith was by his own description, "in the business of loaning money and purchasing secured interests in trust deeds." (Tr.V.I, p. 147). He eventually invested in some 80 properties through Debtors, making money on about 55 of that number. (Tr.V.I, p. 106). On each property in which he invested, Smith received a properly perfected secured deed of trust.

Smith testified that financial information including income and assets listed on a "1003" standard industry loan application provided by the pair constituted part of the basis for his investing with Debtors. (Tr.V.I, pp. 115–116). Smith related this testimony without objection. Nevertheless, Smith failed to produce a copy of the document allegedly portraying Debtors' financial picture. Moreover, Smith later said that Debtors had made representations of income orally, inconsistent with his earlier insistence that they had made such representations in writing. (Tr.V.I, p. 141). Smith also testified that because of the representations made by certain third party real estate brokers, and on the 1003 of Debtors' income from the venture, he did not inspect every property before investing. (Tr.V.I, pp. 123–125). Further, Smith attempted to make a great deal of the assertion that on several properties he did visit, the work Young related would be done was never finished. (Eg., 2640 69th Street, see, Tr.V.I, pp. 117–118). The record, however, contains nothing to establish that at the time he showed Smith the properties, Young never planned to complete such work.

In addition, comparable with the representations made to Malenbaum and Camilla, Smith said Young told him that each property had associated with it a separate escrow account. The escrow accounts supposedly prevented funds such as those he invested, which he dedicated to certain specific properties, from being commingled with general account funds used to run the business or perform work on other properties. (Tr.V.I, p. 112). Nevertheless, while adamant about his reliance on Debtors' representations concerning profits and net worth, Smith never testified that he relied on the existence of the escrow accounts to support his decision to put money into Develacor. In addition, after learning that no escrow accounts truly existed on the properties, Smith continued to invest. (Tr.V.I, pp. 112–113).

During the summer of 1995, Debtors started experiencing a cash flow problem. After enjoying some success investing in small homes worth roughly $100,000, they had decided in the six months before their cash flow difficulties to invest in three large residences of upwards of $500,000 in value. At around that time, however, the real estate market for premium homes declined significantly. Moreover, Develacor lacked the expertise and financial wherewithal to afford the additional time and expense of renovating large and exclusive homes. On seeing these problems, and in an effort to save all or part of the investment he had made in the homes Develacor had yet to be sold, Smith began taking an active hand in operating the business. Smith denied these actions in direct testimony, (Tr.V.I, p. 111), the Court, nevertheless, finds Smith's denial directly contradictory with the documentary record. (Exhibits A, B and C). By September of 1994, Smith began directing Young, Anna Marie, and other Develacor staff in how to market the properties yet to be sold, and in how to solicit further investors, specifically instructing Develacor sale people on procedures that would maximize their chances for closing sales or obtaining funds.

In September of 1994, Smith also invested $125,000 in exchange for another deed of trust in a property called La Jacaranda. (Tr. V.I, p. 128). Smith claims that Young told him this would be a short-term investment to provide funds over an interim period until

Malenbaum could obtain monies to purchase the position on the death of his ailing father. (Tr.V.I, p. 128). Only much later, Smith testified, did Malenbaum and Smith meet one another, comparing notes to learn that Young had led both to believe that one would buy the other out. (See, Tr.V.I, p. 60). According to Smith, both Smith and Malenbaum invested in the same property simultaneously, each being told the other stood ready to buy the first out a short while later. (Tr.V.I, p. 128). Mallenbaum, however, testified that he invested in La Jacaranda in June of 1994, while Smith invested in the property in September of that year. (Tr.V.I, pp. 39–40, 128). In addition, by the time Smith invested in the property, he had already involved himself in the management decisions of Develacor to such an extent that he likely knew or should have known of Malenbaum's June investment. (Tr.V.III, pp. 75–76). Thus, the Court finds itself unconvinced that events connected with the La Jacaranda property occurred in the sequence Smith describes, especially given Smith's intimate involvement with Develacor at the time Smith advanced funds.

Furthermore, the evidence presented at trial never established that, either before Smith began directing the operations of Develacor, or later when Smith had full access to all records, did Young ever fail to provide an accounting of the funds Smith entrusted to Young. Indeed, Smith made few such allegations. The only express claim of Young's failure to account—the purported disappearance of the $125,000 allegedly invested in September 1994, in the La Jacaranda property—the Court finds insufficiently credible or corroborated to satisfy the preponderance of evidence standard. After Smith moved to take control of Develacor's operations in late summer or early fall of 1994, and until the business finally ceased operations, Smith had ample opportunity to request an accounting at any time, and if none were forthcoming, more than sufficient access and resources to gather evidence of defalcation. All this occurred well before seizure of Develacor's records by the San Diego District Attorney's office, which both parties agree transpired as part of a criminal investigation. The Court finds that, had evidence of Young's defalcation presented itself to Smith over the months he had full access to Develacor offices, Smith would have gathered and documented it, and would have later marshaled it at trial. Smith's failure to do so leads the Court to infer that, more likely than not, such evidence did not exist. The Court further makes the specific finding that Smith lacks credibility with regard to his testimony that he would never have invested in the La Jacaranda property had Young not represented that Malenbaum would shortly buy-out Smith's position. (Tr. V.I, p. 129). This investment mirrored the some 80 others Smith invested in with Develacor, (Tr.V.I., p. 106), and the Court sees no reason to think Smith would have withheld funds in this particular instance absent Young's purportedly unique assurances of a quick turn-around.

Finally, to address Smith's credibility overall, the Court finds enough contradictions, misstatements and ambiguities in Smith's testimony to warrant discounting much if not all of it. For instance, Smith denied ever becoming "involved in the Defendant's real estate activities." This is flatly untrue. (E.g., Exhibits B and C). What is clear from the testimonial and documentary record is that Smith began his investment with Develacor at arms' length, but by September 1994, and likely sooner, Smith had taken a firm hand in controlling the destiny of the company, and the properties it owned or managed. (E.g. Tr.VIII, pp. 75–76). Smith involved his own business associates and even his own relatives in this taking of control, and used his position to ensure he made the most of whatever value was left in the firm's assets, without regard for the interests of fellow investors. While this may be understandable given Smith's stake in the venture, it is also perhaps the size of this stake that has detracted from Smith's capacity for candor. In sum, based on both Smith's testimony on the stand and on his failure to produce at trial documentation available to him prior to its seizure by the District Attorney, which would have supported his allegations of actual fraud and defalcation, the Court finds Smith's testimony without credibility.

## II. CONCLUSIONS OF LAW

 This Court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This is a core proceeding for purposes of § 157(b)(2)(I). On the issue of the determination of non-dischargeability of debts, the Ninth Circuit imposes a "weighty burden" on creditors, strictly construing exceptions to discharge in order to further Congress's policy of affording debtors a fresh start. *In re Rahm*, 641 F.2d 755, 756–57 (9th Cir.1981); *Quarre v. Saylor (In re Saylor)*, 178 B.R. 209, 214 (9th Cir. BAP 1995); *McCrary v. Barrack (In re Barrack)*, 201 B.R. 985, 989 (Bankr.S.D.Cal.1996). Notwithstanding the weighty burden, however, in order to prevail, a plaintiff need only establish the elements of a § 523 action by a preponderance of the evidence. *See, Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

### A. 11 U.S.C. § 523(a)(2)(A)

 The Ninth Circuit Court of Appeals has established the elements of fraud pursuant to 11 U.S.C. § 523(a)(2)(A): [2]

(1) The debtor made the representations;

(2) That at the time he knew they were false;

(3) The debtor made the representation with the intention and purpose of deceiving the creditor;

(4) That the creditor relied on such representations;

(5) That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*Id.; Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir.1996); *Eugene Parks Law Corporation Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992). Such a determination is a question of federal, not state law, and courts must interpret these elements consistent with the common law definition of the term actual fraud, as set forth in Restatement (Second) of Torts (1976) §§ 525–557A. *Kirsh*, 973 F.2d at 1457; *Field v. Mans*, —— U.S. ——, ——-——, 116 S.Ct. 437, 443–444, 133 L.Ed.2d 351 (1995).

Courts typically categorize representations as either express representations or implied representations. *Interfinancial Corp. v. White (In re White)*, 130 B.R. 979, 985 (Bankr.Mont.1991); *In re Union Bank of the Middle East, Ltd.*, 127 B.R. 514, 518 (E.D.N.Y.1991). "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'" *Matter of Newmark*, 20 B.R. 842, 854 (Bankr.E.D.N.Y.1982) (quoting *In re Schnore*, 13 B.R. 249, 251 (Bankr. W.D.Wis.1981)). The "conceptual difficulty attending such a fine differentiation," however, leads courts to typically ignore the negligible difference between the two phrases. *Id.*

 As to elements (2) and (3) regarding present state of mind, although a plan to deceive is never "presumed," a party's conduct may allow a court to infer the elements of knowledge, falseness and intent to deceive. *White*, 130 B.R. at 985.

 Upon a showing of intentionally made omissions or false representations, a plaintiff must also establish the plaintiff's reliance on the representations in question. *Field*, —— U.S. at ——, 116 S.Ct. at 438 (1995). In determining whether plaintiffs have proven reliance, courts must decide whether a plaintiff has show the existence of (1) reliance in fact; and (2) justifiable reliance. *Id.* With regard to the first prong of the reliance inquiry, the Supreme Court held in *Field v. Mans* that "the greater the distance between the reliance claimed and the

---

2. § 523(a)(2)(A) reads:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ...

limits of the reasonable, the greater the doubt about reliance in fact." *Field,* — U.S. —, 116 S.Ct. at 438. As for the second prong, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.* at —, 116 S.Ct. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations are made. The *Field* opinion further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id.* (quoting § 541, Comment a., Restatement (Second) of Torts (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte,* 96 F.3d at 1322.

■ Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a plaintiff must establish that a claim sought to be discharged arose from an injury proximately resulting from the plaintiff's reliance on an intentionally made false representation. *Britton v. Price (In re Britton),* 950 F.2d 602, 604 (9th Cir.1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* at 604. Further, as the Supreme Court ex-

plained in *Field,* a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts," for guidance on this issue. *Field,* — U.S. at —, 116 S.Ct. at 443.

■ Turning to the Restatement, proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in [the plaintiff's] loss, § 546; and (2) legal causation, which requires the plaintiff's loss to have been "reasonably expected to result from the reliance," § 548A. In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern National Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir.1992).

Applying the foregoing to the evidence at bar, the Court finds that the Malenbaum Plaintiffs have met their burden of proof to deny discharge of the debts owed them by Young. Plaintiffs Ron Smith and Lead Resources of America, Inc., however, have failed in their burden of proof.

### 1. *Malenbaum Plaintiffs*

■ Considering the elements of § 523(a)(2)(A) one at a time, Young made certain representations to the Malenbaum Plaintiffs in order to induce them to invest money with himself and Anna Marie Warrender. These representations included that the Malenbaum Plaintiffs' investments would be secured by real property. Indeed, most of the instruments memorializing the investment agreements made between Young and the Malenbaum included explicit language describing them as secured deeds of trust, which Young represented would be filed of record against the titles to the property on which Young said the funds solicited would be used. Young also represented to the Malenbaum Plaintiffs that their funds would be segregated from the general operating account in special accounts for each investment property.

Young knew, however, at the time he made such representations that they did not reflect

the truth. For instance, Young admitted at trial to having sufficient understanding of real estate law, from his experience and training in New Mexico, as well as in California, that a "Note Secured by Deed of Trust" needed to be filed of record against the title of the security to protect the holder of the interest. Yet, Young never recorded such interests. The Court infers from Young's actions—which he took after he specifically told the Malenbaum Plaintiffs they would be secured, despite knowing a trust deed must be recorded to be perfected—that he never intended such result. Young also knew at the time he told the Malenbaum Plaintiffs the funds would be segregated by investment property that no such separate accounting ever existed or would exist.

■ Incredulously, Young claims the words "Note Secured by Deed of Trust" printed on the written documents and prepared by Debtors to evidence the Malenbaum Plaintiffs' investments, appear there by mistake, and that he never said they would be secured investments or that the Malenbaum Plaintiffs' interests would be secured or recorded. The Court deems such testimony a bold falsehood. The Court infers that Young's experience in real estate told him enough about the legal effect of such language that he knew he should prepare and review carefully loan documents for form and content. Debtors included the language on the documents specifically to induce the Malenbaum Plaintiffs to invest with them, and to reassure the Malenbaum Plaintiffs that such investments would enjoy secured status. Thus, Young intended the misrepresentations to deceive.

■ Moreover, not only did the Malenbaum Plaintiffs actually rely on the foregoing representations, satisfying the first prong of the reliance element of § 523(a)(2)(A), but, in satisfaction of the second prong, they did so justifiably as well. Both Young and Malenbaum testified that family-like fealty constituted the basis for Debtors' solicitation of the real estate investments with the Malenbaum Plaintiffs, and that such family and family-like loyalties buttressed the Malenbaum Plaintiffs' trust in Young. They had a total ignorance of the intricacies of California real

estate law and so relied with justification on the representations of Young, who styled himself as a thoroughly knowledgeable real estate professional and highly successful entrepreneur anxious to do well by his wife's family. They felt they could trust him at his word to protect their interests.

In dispute of the Malenbaum Plaintiffs' reliance in fact, Young has suggested in post-trial memoranda that the Malenbaum and Camilla should have engaged California legal counsel for advice on the investment Young encouraged them to undertake. Young also implied that given the relatively high 20% returns on these investments, the Malenbaum Plaintiffs should have known they would not be secured and that given such rates of return, reliance on the secured status to the investment would not have been reasonable. Consequently, Young would have this Court follow the Supreme Court's teaching in *Field* that the less reasonable a plaintiff's claims of reliance, the less likely the existence of reliance in fact, *Field*, —— U.S. at ——, 116 S.Ct. at 438, and conclude that the Malenbaum Plaintiffs did not actually rely on Young's representations as to their secured status.

The Court agrees that had strangers approached Malenbaum and Camilla with the deal Debtors offered them, or had they solicited contact with Develacor in response to its newspaper advertisements, it would only have been reasonable for persons of their expertise to investigate independently, with the counsel of a competent advisor. Under the circumstances, however, in which family members approached them unsolicited, the reliance of Malenbaum and Camilla upon the munificence of Debtors, people with whom they had close, even family, relationships was reasonable. This reasonableness buttresses the Malenbaum Plaintiffs' claim of reliance in fact.

■ In addition, their reliance was justifiable. Under the holding of *Field*, only if a dupe has reason to suspect the presence of a misrepresentation, or is in a position to easily investigate a central fact involved in a representation, does a duty to further inquire arise. *Id.*, —— U.S. at ——, 116 S.Ct. at 444.

The record contains nothing to indicate the Malenbaum Plaintiffs should have had suspicions about the veracity of Camilla's sister and brother-in-law until December of 1994. At that point, however, Malenbaum did make vigorous efforts to verify whether their investments were in fact secured, and would invest no more money until his suspicions were allayed. Finding no reassurance upon his investigation, the Malenbaum Plaintiffs advanced no more funds. Thus, the Malenbaum Plaintiffs acted upon what they were justified in viewing as the magnanimity of relatives, but only until they had suspicion that else was in reality the case.

■ The Malenbaum Plaintiffs sustained losses from their investments with Young. At trial, Young attempted to destroy the proximate cause link in the fraud chain by showing that had the Malenbaum Plaintiffs been secured investors, they would have held junior security interests behind other secured investors who eventually foreclosed at a deficiency, leaving other junior investors, secured or otherwise, with unpaid claims. Even assuming such was the case, however, Young's misrepresentations deprived the Malenbaum Plaintiffs of an opportunity to turn down his solicitations. Had they been apprised of either senior security interests, or of their true unsecured status, they could have used such information to decide not to invest funds with Young. In addition, had Young disclosed that their funds were not to be segregated into accounts dedicated to certain properties, but would be placed en masse into one general operating account without adequate tracing mechanisms, they also could have used such information to decline the investments they eventually made. Thus, whether other investors had senior deficient positions in front of where the Malenbaum Plaintiffs would have been had Young recorded their purportedly secured investments disposes of the proximate cause issue of whether the Malenbaum Plaintiffs sustained damages. In light of the foregoing discussion, the Court finds Plaintiffs claim against Debtors non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

■ The Court now turns to the measure of damages. Suits "by a third party creditor ... against the debtor (and thus the bankruptcy estate), are 'core proceedings' under 28 U.S.C. § 157(b)(2)(B). Consequently, bankruptcy courts have jurisdiction to adjudicate the validity and amount of claims together with their dischargeability." *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–966 (6th Cir. 1993). In confirming bankruptcy courts' jurisdiction in such matters, in harmony with other circuits, the Ninth Circuit Court of Appeals recently concluded:

We are particularly persuaded by the analysis of one bankruptcy judge:

> If it is acknowledged as beyond question that a complaint to determine dischargeability of a debt is exclusively within the equitable jurisdiction of the bankruptcy court, then it must follow that the bankruptcy court may also render a money judgment in an amount certain without the assistance of a jury. This is true not merely because equitable jurisdiction attaches to the entire cause of action but more importantly because it is impossible to separate the determination of dischargeability function from the function of fixing the amount of the non-dischargeable debt.

*In re Devitt*, 126 B.R. 212, 215 (Bankr. D.Md.1991).

*Kennedy*, 108 F.3d at 1017 (9th Cir.).

■ Section 523(a)(2)(A) limits recovery, however, to only "money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained, by" a false representation or actual fraud. This means a judgment entered under § 523(a)(2)(A) cannot exceed the amount of benefits the fraudulent conduct created for a defendant. *Palmer v. Levy (In re Levy)*, 951 F.2d 196, 199 (9th Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1059 (9th Cir.1994). Further, "obtained" means "to get possession of; to procure; to acquire." BLACK'S LAW DICTIONARY 1078 (6th Ed.1990); *Medley v. Owen (In re Owen)*, 181 B.R. 288, 290 (Bankr. W.D.Va.1995). Courts have relied upon a

literal reading of "obtain" under § 523(a)(2)(A) to limit non-dischargeable claims to the actual benefit to the debtor, rather than the full range of compensatory damages (such as the total amount due on a breached contract entered into as a result of fraud), consequential damages or punitive damages. *Levy,* 951 F.2d at 199; *Owen,* 181 B.R. at 290. In other words, § 523(a)(2)(A) provides no relief for damages "caused" by a debtor's fraudulent conduct, but merely for those benefits "obtained" by a debtor through fraud. *Levy,* 951 F.2d at 198; *Owen,* 181 B.R. at 290–291; *but see, Cohen v. De La Cruz (In re Cohen),* 106 F.3d 52, 58 (3rd Cir.1997) (punitive damages non-dischargeable under § 523(a)(2)(A)).

In the case at bar, in part due to the inability to secure pertinent records seized by the District Attorney's office in a criminal investigation against Young, both the Smith and Malenbaum Plaintiffs argue that the Court has no obligation to set the amount of damages caused by Young's fraud. They further assert that since liquidating those damages without the pertinent evidence would be unwarranted, the Court should simply declare the damages non-dischargeable and allow the state courts late determine the amount of those damages at a later date. The Plaintiffs in the instant action, however, do not support this proposition with any binding precedent. Further, the Court disagrees that the cases they do cite require liquidation of damages against Young in this case to be determined at a later date in another forum.

■ For instance, in *U.S. v. Stelweck (In re Stelweck),* 86 B.R. 833, 844 (Bankr.E.D.Pa. 1988), a precedent not binding in this jurisdiction, the court declined to liquidate a claim for a governmental fine, penalty or forfeiture under § 523(a)(7) because the governmental entity had yet to assess the amount owed. Thus the court concluded it would not speculate without evidence as to what the amount would be, but would simply deny discharge on the amount to be adjudicated elsewhere. On the other hand, in another case cited by Plaintiffs, the 10th Circuit Court of Appeals frankly instructed the bankruptcy court on remand "to declare the debt non-dischargea-ble in an amount which it can reasonably estimate as obtained by fraud." *John Deere v. Gerlach (In re Gerlach),* 897 F.2d 1048, 1051 (10th Cir.1990). This the Court proposes to do.

As earlier recited, the Malenbaum Plaintiffs turned over $272,000 for investment in Develacor properties. The amounts due on the promissory notes evidencing such debts reflect a 20% premium on investment. The premium, however, did not benefit Young and Develacor. They obtained through their fraudulent acts only the initial funds tendered. Thus only the $272,000 in funds the Malenbaum Plaintiffs entrusted to Young satisfy the *Levy* and *Owen* construction of § 523(a)(2) damages. *Levy,* 951 F.2d at 198; *Owen,* 181 B.R. at 290–291. Therefore, the sum of $272,000 on the Malenbaum Plaintiffs' claims against Young are non-dischargeable under § 523(a)(2)(A).

### 2. *Smith Plaintiffs*

■ The Smith Plaintiffs failed in their burden of proof on several elements of § 523(a)(2)(A). First, Smith received the secured positions he says Young promised him. Second, Smith has failed to show that at the time he consulted with Smith about specific construction plans, assuming such were actually discussed as Smith contends, Young never intended to complete those plans. At worst, Young's failure to finish the homes amounts to garden variety breach of contract. Finally, Smith has failed to show he actually or justifiably relied on any of the representations made by Young about commingling of funds, or on Young's statements of income and assets.

By his own account, Smith has extensive experience and seasoning investing in trust deeds, and clearly from his testimony, possesses a working knowledge of the intricacies of real estate investing. For one of Smith's background engaged in arms' length transactions learned of through newspaper advertisements, it would not have been reasonable in the California real estate market to blandly rely on any and all promoter representations without taking steps to secure written verification of such descriptions. For instance, Smith claims Young told him, as Young did Malenbaum, that funds would be

segregated in escrow accounts dedicated to individual properties. Smith could easily have acquired proof of such escrow accounts in the form of copies of escrow agent records before remitting funds. Smith never explained why he did not do so. From the foregoing, the Court finds Smith's claims of reliance unreasonable, thus undermining Smith's reliance in fact. In other words, Smith's lack of reasonable reliance casts great doubt on whether such reliance was actual. *Field,* —— U.S. at ——, 116 S.Ct. at 438.

Furthermore, Smith failed to testify specifically that he relied on such representations. Smith has an affirmative duty to aver, prove and explain his actual reliance, and how that reliance was justified. Finding no such proof or explanation in the record, the Court determines that Smith failed to meet the actual and justifiable prongs of the reliance element of § 523(a)(2)(A). In reality, Smith based his reliance on what he perceived to be the underlying value of the properties before and after renovation, independent of anything Young may or may not have said. (Tr.V.III, p. 87). Such explains Smith's insistence on secured positions in the property, and his failure to concern himself with the bona fides of Develacor or its principals.

Finally, if as Smith recounts, he had relied on Young's purported misrepresentations about the La Jacaranda investment with regard to Malenbaum's agreement to buy out Smith's short term position in the property after a brief span of time, he might have had justification in so doing. After-all Young had helped him turn a number of lucrative investments. Nevertheless, by that point in time— late 1994—Smith had enough worries about the company and its officers to have stepped in and taken a firm lead in attempting to return it to profitability. Given the gravity of these concerns, and the measures he deemed required to remedy them, he had no grounds for relying on Young's assurances that the company could turn $125,000 around in such a brief time frame. Furthermore, Smith has failed to convince the Court that Young even made such representations. Given the foregoing, Smith has failed to establish the elements of § 523(a)(2)(A) by a preponderance of evidence.

### B. *11 U.S.C. § 523(a)(4)*

Bankruptcy Code § 523(a)(4)[3], precludes discharge of debts incurred by "fraud or defalcation while [the debtor was] acting in a fiduciary capacity, embezzlement or larceny." The threshold issue *sub judice* concerns whether a debtor acted "in a fiduciary capacity" when committing acts alleged to constitute defalcation. The Ninth Circuit Court of Appeals has held:

> The meaning of "fiduciary" in § 523(a)(4) is an issue of federal law. *See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934); *[In re] Pedrazzini,* 644 F.2d [756] at 758 [9 Cir.1981]. The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. *See Angelle v. Reed (In re Angelle),* 610 F.2d 1335, 1338–39 (5th Cir.1980). The trust giving rise to the fiduciary relationship must be imposed prior to any wrongdoing; the Debtor must have been a "trustee" before the wrong and without reference to it. *Davis,* 293 U.S. at 333, 55 S.Ct. at 153–54; *Pedrazzini,* 644 F.2d at 758. These requirements eliminate constructive, resulting or implied trusts. *Pedrazzini,* 644 F.2d at 759.

> Although the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be consulted to determine when a trust in this strict sense exists. *Id.* at 758.

\* \* \* \* \* \*

---

**3.** § 523(a)(4) reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

*Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986).

To satisfy this standard there must exist either an express or statutory trust prior to any wrongful acts. *Gordon v. Stephenson (In re Stephenson),* 166 B.R. 154, 159 (Bankr.S.D.Cal.1994) (citing BAP case law). The elements of such trusts include: (1) adequate language to create a trust; (2) a specific subject; and (3) an identifiable subject or res. *Id.* As Judge Brody explained in *Stephenson,* "The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust." *Id.* (Quotation marks omitted). The court further expounded that in California, one who acts, for compensation or the expectation of compensation, to solicit "borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity" falls within the definition of a "real estate broker," regardless of whether the actor possesses a real estate broker's license. *Stephenson,* 166 B.R. at 158, fn. 4, and 159 (citing Cal.Bus. and Prof.Code § 10131).

In addition, the Ninth Circuit Bankruptcy Appellate Panel has held:

> A trust is defined as "a fiduciary relationship *with respect to property,* subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person...." Restatement (Second) of Trusts § 2 (1959) (emphasis supplied). Thus a requirement of a trust relationship is a trust res—money or property that is entrusted to the debtor-fiduciary. *In re Gans,* 75 B.R. 474, 490 (Bankr.S.D.N.Y. 1987); see *Restatement (Second) of Trusts,* § 74 (1959) (a trust cannot be created unless there is trust property).

In certain instances a real estate broker may be placed into the role of a fiduciary under a technical or express trust. For example, California statutes and administrative regulations impose trust obligations on a broker with respect to funds held by a broker on behalf of a client. See Cal.Bus. & Prof.Code § 10145; Cal.Admin.Code, Title 10, §§ 2831, 2831.1. Similarly, a number of bankruptcy cases have determined that a real estate broker who receives funds from his or her client for a specific purpose acts as a fiduciary under section 523(a)(4) with respect to those funds. See, e.g., *In re Currin,* 55 B.R. 928 (Bankr. D.Colo.1985).

*Evans v. Pollard (In re Evans),* 161 B.R. 474, 478 (9th Cir. BAP 1993). In harmony with the foregoing BAP analysis, the bankruptcy court in *Stephenson* also held that, where a real estate broker holds funds for later investment in specific properties, California statutes "identify the specific res and impose identifiable fiduciary duties on a broker." *Stephenson,* 166 B.R. at 159 (Footnote omitted).

Moreover, besides the existence of a fiduciary relationship, to prevail under § 523(a)(4), a plaintiff must prove a fiduciary committed fraud or defalcation. *Id.* at 479; *Lewis v. Scott (In re Scott),* 97 F.3d 1182, 1186 (9th Cir.1996). In *Lewis,* the Ninth Circuit Court of Appeals defined defalcation thus:

> [T]he "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." BLACK'S LAW DICTIONARY 417 (6th ed.1990). Under § 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." ... An individual may be liable for *defalcation* without having the intent to *defraud.*

*Id.* at 1186–1187 (citations omitted, emphasis added). Once a plaintiff shows the existence of a defalcation, "[u]nder California law the burden then shifts to the fiduciary to render an accounting." *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1461 (9th Cir.1997).

Finally, the Bankruptcy Code does not limit the measure of damages available under § 523(a)(4) so restrictively as it does under § 523(a)(2). *Bugna,* 33 F.3d at 1054. In *Bugna,* the Court confronted whether punitive damages arising from a state court judgement of defalcation of fiduciary duty were subject to discharge under § 523(a)(4). Assessing the plain language of

the statute, the Ninth Circuit Court of Appeals explained:

> Section 523(A)(4) provides that a debtor cannot discharge any "debt ... for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(A)(4). Thus, by its express terms, section 523(A)(4) precludes [debtor] from discharging his entire liability to [creditor] only if a state court judgment imposing punitive damages is a "debt" within the meaning of section 523(a). The only other issue under section 523(a)(4)—whether the punitive damages were imposed for fraud while acting in a fiduciary capacity—is easily resolved: The punitive damages [debtor] seeks to discharge were imposed in a state court action for fraud and breach of fiduciary duty.

*Id.* at 1058. The court went on to espouse that, under § 523(a)(4), the dischargeability of both punitive and the full range of compensatory damages depends on whether such claims represent a debt. "The Code defines 'debt' as 'liability on a claim,' 11 U.S.C. § 101(12), and a 'claim' as a 'right to payment, whether or not such right is reduced to judgment.' 11 U.S.C. § 101(5)(A)." *Id.* Concluding,

> Whether for compensatory or punitive damages, a state court judgment is a "right to payment," and thus a "debt" within the meaning of section 523(a)(4). Any other interpretation of the term "debt" would stretch credulity; after all, if it applies to nothing else, the Bankruptcy Code applies to state court judgments.

*Id.* The very same analysis goes for bankruptcy court judgments in adversary proceedings.

Finally,

> "'the award of prejudgment interest in a case under *federal* law is a matter left to the sound discretion of the trial court. Awards of pre-judgment interest are governed by considerations of fairness and are awarded when it is necessary to make a wronged party whole.'" (Emphasis added).

*Purcell v. U.S.,* 1 F.3d 932, 942–943 (9th Cir.1993) (quoting *United States v. Calif. State Bd. of Equalization,* 650 F.2d 1127, 1132 (9th Cir.1981), *aff'd mem,* 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 157). Before the award of prejudgment interest, however, the amount of the contested payment must be determinate "prior to the bankruptcy court's judgment." *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 818–819 (9th Cir.1994); *Shannon v. Russell (In re Russell),* 203 B.R. 303, 316–317 (Bankr.S.D.Cal. 1996).

Moreover, while the Supreme Court has held that a complaint under 11 U.S.C. § 523(a)(2)(A) constitutes an action governed by federal common law, *Field,* —— U.S. at ——, 116 S.Ct. at 443, it could be argued that since the standards for substantive adjudication under § 523(a)(4) depend on state law, the criteria for award of prejudgment interest under § 523(a)(4) should also hinge on state mandates. With this in mind, the Court holds that in California, a trier of fact may, in its discretion, award as damages prejudgment interest in "an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice." Cal.Civ.Code § 3288 (West 1997); *Greenfield v. Insurance Incorporated,* 19 Cal.App.3d 803, 813, 97 Cal.Rptr. 164, 170 (Cal.Ct.App.1971); *Newby v. Vroman,* 11 Cal.App.4th 283, 289, 14 Cal.Rptr.2d 44, 47 (Cal.Ct.App.1992). Further, although in actions alleging breach of contract the amount of contested payment must be determined prior to judgment to support the award of prejudgment interest, Cal.Civ.Code § 3288 (West 1997), in actions alleging "oppression, fraud or malice" the language of the statute does not require the presence of previously determinate damages to justify prejudgment interest. Cal.Civ.Code § 3288 (West 1997). Moreover, in cases of multiple tort-feasors where one defendant settles out of an action on a stipulated judgment, such as in the case *sub judice,* a court may calculate prejudgment interest against the non-stipulating defendant without subtracting the amounts agreed to by the stipulating defendant. *Newby,* 11 Cal.App.4th at 289, 14 Cal.Rptr.2d at 47.

Applying the foregoing standards to the case at bar, the Court finds that a fiduciary relationship existed between the Malenbaum Plaintiffs and Young. First, Young,

as a family member, used his relationship with Malenbaum and Camilla to gain their confidence. He then represented that if they entrusted funds with him, he would secure the investments with deeds of trust, and segregate those funds in escrow or other accounts to further protect their investment. Thus, he acted as a broker with fiduciary duties. *Stephenson,* 166 B.R. at 159.

With regard to an identifiable trust res, in *Evans,* the BAP held that no trust relationship arose sufficient to support an action under § 523(a)(4) where, although there was a trust relationship between a real estate broker and her principals, no identifiable property was ever entrusted to her care. Thus, no identifiable trust res existed, and therefore § 523(a)(4) did not apply. *Evans,* 161 B.R. at 474, 478. In the instant case, however, unlike in *Evans,* Young's receipt of entrusted funds did create the necessary identifiable trust res. From the circumstances of Young's acts as a broker, together with the Malenbaum Plaintiffs entrustment to him of funds for specific investment purposes, arose an express trust relationship between the parties within the meaning of § 523(a)(4). Finally, not only has the Court has already elaborated the fraud committed by Young against the Malenbaum Plaintiffs, Young's "misappropriation of trust funds or money" held in his fiduciary capacity, and his failure "to account fully" for the misappropriated funds constituted acts of defalcation. *Scott,* 97 F.3d at 1186–1187; *Niles,* 106 F.3d at 1460–1461.

 Exhibit 17 evidences the full range of damages arising from these acts. In this document, Debtors, represented by counsel, "agree that they are jointly and severally indebted in the aggregate sum of $301,315 to" the Malenbaum Plaintiffs. Young formally acknowledged this statement of debt on November 7, 1995, well prior to entry of judgment. In addition, the Court has found for the Malenbaum Plaintiffs on their allegations of fraud. Consequently, under either the federal standards governing the award of prejudgment interest, which require previously determinate damages, or under the California standards for prejudgment interest in cases of fraud, which contain no such requirement, the Court may in its discretion also except from Young's discharge prejudg-

ment interest on the aggregate sum of $301,-315, calculated at the legal rate of return from the date of Young's acknowledgment to the date of this Order. In the Court's judgment, considerations of fairness require such a ruling. Young fraudulently acquired funds falsely promising a return on investment. Consequently, not only did the Malenbaum Plaintiffs contemplate getting their money back from Young, but they contemplated receiving a premium on those funds as well. Thus, in order to make the Malenbaum Plaintiffs whole, their award must include interest on their losses. *Purcell,* 1 F.3d at 943. In other words, either Young or the Malenbaum Plaintiffs must bear the opportunity costs of the Plaintiffs' decision to entrust their money to Develacor. Under the circumstances, the Court concludes those costs lie better with Young.

 As for the Smith Plaintiffs, the Court finds that under the same "fiduciary" analysis as that applicable to the Malenbaum Plaintiffs, Young bore the responsibilities of a fiduciary in his relationship with Smith, at least until Smith began guiding Develacor's activities in the latter half of 1994. The evidence, however, failed to establish the existence of any fraud or defalcation. The Court analyzed in detail and disposed of the issue of Young's alleged fraud against Smith in part **III. A. 2.,** *infra.* On the issue of defalcation, Smith says that when he invested with Young, funds were to be placed in escrow and dedicated to particular properties. Nevertheless, while the record shows that Malenbaum's funds were commingled, (see Exhibit 1H), no direct evidence shows the same occurred with Smith's funds. More important, whether escrow accounts in fact existed, the record contains no evidence that the funds Smith entrusted to Young for dedication to specific properties were not in fact so applied, or were otherwise misused. Had Smith succeeded in establishing that Young misappropriated funds, the burden would then have shifted to Young to "render an accounting" sufficient to "persuad[e] the trier of fact that [Young] complied with [his] fiduciary duties with respect to all questioned transactions." *Niles,* 106 F.3d at 1461. Since Smith failed in his burden of showing a misuse or misappropriation, the Court's inquiry must end. *Id.*

In addition, while Young's treatment of the Malenbaum Plaintiffs investments provides some evidence that Young may have treated Smith's funds the same way, Smith had full access to the pertinent records to determine whether and to what extent his funds did not go toward purchase and development of the properties Young said they would go to. Indeed, after Young's removal from the company, (Exhibit 24), Smith, the principal, had greater access to records that did Young, the fiduciary. Again, the Court infers from Smith's inability to produce such records that, more likely than not, they do not exist. This also undermines Smith's argument that Young had better access to Develacor records than did Smith. *See Niles,* 106 F.3d at 1461. Furthermore, Smith presented no evidence that he had ever requested an accounting from Young, or that Young could not have provided such had a request ever been made prior to the District Attorney's seizure of documents. The Court therefore concludes that Smith has failed in his burden of proof on the issue of Young's defalcation in relation to Smith's investments.

### C. 11 U.S.C. § 523(a)(6)

Section 523(a)(6)[4] of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The burden falls on the creditor to prove that an injury was both "willful" and "malicious," by a preponderance of the evidence. *Snoke v. Riso (In re Riso),* 978 F.2d 1151, 1154 (9th Cir.1992). Furthermore, "it is well settled that a simple breach of contract is not the type of injury addressed by § 523(a)(6). *Id.*

The Ninth Circuit has defined willful and malicious in the following terms. A wrongful act "done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Impulsora Del*

*Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440, 1442–1443 (9th Cir. 1986) (citations omitted); *Bond's Jewelers, Inc. v. Linklater (In re Linklater),* 48 B.R. 916 (Bankr.D.Nev.1985) (the court reasoned "[t]he term 'willful and malicious', as used in § 523(a)(6), does not necessarily mean ill will, spite, or personal hatred. An act injuring the property interests of another is willful and malicious for § 523(a)(6) purposes if it is without knowledge or consent, intentional, and unjustified or unexcused.").

▮ Having found for the Malenbaum Plaintiffs under § 523(a)(2)(A) and (a)(4), the Court will consider only the merits of the Smith Plaintiffs § 523(a)(6) claims. Applying the pertinent standards to the evidence presented by the Smith Plaintiffs at trial, the Court finds that while Smith presented evidence that Young failed to fulfil promises to Smith to renovate certain properties in certain ways specified beforehand, such as adding second levels to one story homes, these deficiencies amounted to no more than mere breach of contract. In order for such claims to support a § 523(a)(6) action, Smith would have had to show that Young had the ability to fulfil these contracts, but chose not to do so. Smith presented no evidence whatsoever to suggest Young had the financial capacity and necessary municipal endorsement to complete his construction bargains with Smith.

Finally, Young filed a counter complaint against Smith seeking indemnification for any award made to the Malenbaum Plaintiffs. Young's cryptic pleadings labor to assert that Smith had close control over Develacor, knew of the Malenbaum Plaintiffs' interests, and in foreclosing on properties the Malenbaum Plaintiffs had invested in without informing them of the transactions, deprived them of an opportunity to protect their interests by buying out senior positions. While a provocative theory, the evidence fails to support the un-

---

**4.** § 523(a)(6) reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

 * * * * * *

(6) for willful and malicious injury by the debtor to another entity or to the property of

another entity;

derlying facts alleged. Consequently, the Court finds for Smith on Young's counterclaim.

### *Conclusion*

The Court finds from the evidence that the Malenbaum Plaintiffs have met their burdens of proof under both § 523(a)(2)(A) on Young's commission of actual fraud, and § 523(a)(4) for Young's defalcation of fiduciary duties. Specifically the Court finds that Mark A. Young deliberately misrepresented to Ron Malenbaum and Camilla Warrender that funds entrusted to him would be secured by deeds of trust on specific parcels of real property in which they invested, and that each property would be maintained as a separate financial entity. Further, Young and the Malenbaum Plaintiffs had a fiduciary relationship under which Young committed fraud and defalcation by failing to use the funds as promised and by failing to account for such funds. The foregoing litany of wrong-doing entitles the Malenbaum Plaintiffs to a non-dischargeability judgment against Young for $301,315, plus prejudgment interest dating from November 7, 1995, to date, calculated at the legal rate of interest.

On the other hand, the Smith Plaintiffs have failed in their burden of proof under Bankruptcy Code sub-sections 523(a)(2)(A), 523(a)(4) and 523(a)(6). Smith failed to present evidence to establish by a preponderance that Young did not secure Smith's investments with secured deeds of trust as promised, or that Young committed any other fraud against him. Further, while Young did serve as Smith's fiduciary, Smith failed to present sufficiently convincing evidence of defalcation on Young's part. In addition, Smith failed to prove Young's commission of any willful and malicious injury to the Smith Plaintiffs. Consequently, all debts owed them by Young are subject to discharge. Finally, Young has failed in his burden of proof against Smith on his counterclaim. Upon review of the record,

IT IS ORDERED:

1. The Court's March 6, 1997, Findings of Fact, Conclusions of Law and Order are vacated and completely supplanted by the Findings of Fact and Conclusions of Law set forth above;

2. The Plaintiffs shall file with this Court a judgment conforming with the foregoing Findings of Fact and Conclusions of Law, made pursuant to Federal Rule of Bankruptcy Procedure 7052, within ten days from entry hereof;

3. The pertinent parties shall file a written stipulation dismissing Anna Marie Warrender from this adversary proceeding with thirty days, and;

4. Failure to make timely filings will result in appropriate sanctions.